# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**WENDY SUSAN RENNERT-LOVETT**          **CIVIL ACTION**

**VERSUS**                                    **NUMBER: 11-662-BAJ-DLD**

**MICHAEL J. ASTRUE, Commissioner**
**of Social Security**

## MAGISTRATE JUDGE'S REPORT

Plaintiff seeks judicial review of a final decision of the Commissioner denying her claim for disability insurance benefits. In making that final decision, the Commissioner reached the fourth step of the five-step sequential disability analysis set forth in 20 C.F.R. § 404.1520(b)-(f)& § 416.920(b)-(f).[1] The Commissioner determined that plaintiff had the severe impairment of degenerative disc disease of the cervical spine, but that this impairment did not prevent her from performing her past relevant work as a project director and office manager.

### *Background*

Plaintiff protectively filed an application for benefits on June 22, 2009 (TR 130), alleging a disability onset date of December 1, 2007, due to severe back pain, degenerative disc disease, arthritis, chronic fatigue syndrome, depression, and problems sitting, standing or walking for long periods of time. (TR 133). The claim was initially denied on October 16, 2009. Plaintiff filed a timely request for hearing; a hearing was held on May 6, 2010; and an unfavorable decision was rendered on August 25, 2010 (TR 26-39), finding that plaintiff was not disabled from December 1, 2007, through the date of the decision. At the time of

---

[1] *See,e.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

the May 6, 2010, hearing, plaintiff was 53 years old, had a 12th grade education, and past relevant work as a project director and office manager. (TR 35) In his decision following the hearing, he ALJ found that plaintiff had the residual functional capacity ("RFC") to perform a modified range of sedentary work with occasional postural activities and no climbing of ladders, ropes, or scaffolds, and that plaintiff's past relevant work as a project director and office manager were not precluded by this RFC. (TR 33-35) Plaintiff appealed the ALJ's decision, and the Appeals Council declined to review the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.

### Background

The relevant medical history in this matter begins with a radiology report dated November 17, 2006, after plaintiff apparently complained of chest and neck pain to Dr. Lawrence Schneider, her primary care physician. While Dr. Schneider's notes regarding the office visit are not in the record, the radiology report determined that scoliosis was present in the mid-thoracic spine, and the cervical spine results were normal. (TR 248)

Plaintiff's first visit to Dr. Schneider in the records was on May 28, 2007, wherein plaintiff complained of lower back pain and hand pain, and advised Dr. Schneider that she "has been gardening lately." (TR 222) Dr. Schneider's physical examination notes that plaintiff had a full range of motion in her neck and lumbar scoliosis, and his diagnostic impression was lower back pain, rheumatoid arthritis, and status/post massive trauma. Dr. Schneider's notes indicate that plaintiff already was taking the following medications: Soma, HC/APAP, Xanax, Celebrex, and Lexapro, and she was advised to return as needed. (Id.)

Plaintiff returned to Dr. Schneider on July 27, 2007, complaining of lower back pain, neck pain, "mod pain," and pain in joints in hands. Dr. Schneider's exam revealed cervical spine stiffness, and he diagnosed her with rheumatoid arthritis, osteoarthritis, and "massive trauma." (TR 223) Dr. Schneider's records next note that plaintiff's Xanax prescription was refilled on August 8, 2007, and on September 14, 2007, she requested a refill, but did not receive it until September 28, 2007. On October 16, 2007, she again requested a Xanax prescription but was denied. (TR 224) She then returned to Dr. Schneider on October 29, 2007, due to a fall down the stairs at work where she twisted her back and pulled an arm muscle. She requested an increase in her Xanax prescription and "rest med for PM." Her neck showed a full range of motion, and her deep tendon reflexes were 3+. Her current medications were left unchanged. (TR 225) On December 21, 2007, she requested another Xanax prescription, which was denied. (TR 228)

On January 9, 2008, plaintiff complained to Dr. Schneider that she was not sleeping and had headaches, and was diagnosed as perimenopausal. Dr. Schneider prescribed Tranxene, a benzodiazepine, "if necessary." (TR 229) At her next visit to Dr. Schneider of March 19, 2008, plaintiff reported that her "'back is a mess, feels worse and worse all the time,'" and she had "stabbing pains in neck." Dr. Schneider's exam revealed a decrease in the range of motion in her back, and he diagnosed her with rheumatoid arthritis. (TR 231) His notes also indicated that her #90 Norco [hydrocodone/acetaminophen] prescription had been filled on February 2, 2008, and on March 4, 2008, but that she wanted the prescription refilled at this visit, "15 days early." It is unknown, however, whether or not the Norco prescription was refilled as Dr. Schneider's notes were cut-off in the copy provided to the court. (Id.)

Plaintiff returned to Dr. Schneider on June 4, 2008, complaining that she was very sore and stiff, was having trouble with her hands and wrists and holding things, which Dr. Schneider diagnosed as a rheumatoid arthritis flare-up. (TR 233) At her next visit of August 27, 2008, plaintiff continued to complain of multiple joint pain in her hands, neck and right shoulder. Her exam revealed a decrease in the range of motion in her neck, and she was diagnosed with a rheumatoid arthritis flare-up and spinal inflammation. (TR 235) On September 22, 2008, she requested an early refill on her Norco and Soma prescriptions because she "hurt back cleaning up after storm," and she received the early refills. On November 14, 2008, and December 10, 2008, plaintiff complained about pain, which Dr. Schneider attributed to rheumatoid arthritis flare-ups. (TR 237-238)

Plaintiff next returned to Dr. Schneider on February 4, 2009, stating that she had fallen twice "this month," twisted her back and neck, and hurt her hands. She was diagnosed with cervicalgia without radiculopathy, and x-rays and MRI's were scheduled. (TR 239) On February 10, 2009, plaintiff's lumbar spine MRI revealed mild scoliosis with mild hypertrophic spurring, and some decrease in the height of the body of L1. Her cervical spine MRI of the same date revealed broad based disc protrusion at C5-6, compatible with herniation, which causes a mild central stenosis with slight cord effacement with open foramina. (TR 256-257) Her thoracic spine x-ray of February 10, 2009, revealed scoliosis and degenerative changes with narrowing of some of the disc spaces, but no definite fractures. (TR 258)

On March 6, 2009, plaintiff requested a Xanax prescription to help her "get thru" with going to Florida and having to take her brother off life support. (TR 240) On March 19, 2009, plaintiff saw Dr. William Gladney, who diagnosed her with ncv/mild bilateral carpal

4

tunnel syndrome with no other evidence of neuropathy and no evidence of denervation. (TR 342-345). On March 25, 2009, she reported that she had fallen off the back of a pick-up truck and was advised to come see Dr. Schneider. (TR 240). The record does not reflect that plaintiff followed up with Dr. Schneider regarding the fall from the back of the pick-up truck.

The next visit in the record was plaintiff's April 15, 2009, visit to Dr. Schneider, where she complained of "extreme depression," crying a lot," in a "bad state of mind," with constant pain and waking up with both hands numb. She was diagnosed with "grief depression," chronic pain and fatigue and post-traumatic stress disorder. Plaintiff reported to Dr. Schneider on May 13, 2009, that her Doxepin prescription for depression "seems to help," but she still had aches and pains, and had fallen again when she stepped in a hole in her yard and twisted her ankle. (TR 242) On June 22, 2009, Dr. Schneider noted in her records something about a "pharmacy alert" and "possible overutilization of narcotics," with some notes regarding different places where plaintiff was having her prescriptions filled. (TR 243)

She visited Dr. Schneider the following day, June 23, 2009, complaining of rectal bleeding and requesting a lumbar spine MRI, and advised him that she had left her Norco and Metanex prescriptions in Arkansas. Dr. Schneider's exam revealed a full range of motion in her cervical spine, and scheduled a lumbar MRI for July 20, 2009. (TR 244)

Also, on June 23, 2009, Dr. Schneider completed a "Multiple Impairment Questionnaire," a form which appears to have originated from plaintiff's counsel. Dr. Schneider noted that he began treating plaintiff on October 2, 2006, and his diagnoses

were melena,[2] massive trauma follow-up, and low back pain. The clinical findings which supported these diagnoses included a T8 compression fracture, rotoscholiosis, shortened leg due to trauma, musculoskeletal spasm and strain. The laboratory and diagnostic test results which supported these diagnoses included positive rheumatoid arthritis factor, scoliosis on x-ray, C5-6 broad based disc protrusion, and hypertrophic spurring of the lumbar spine. Plaintiff's primary symptoms included chronic pain, irritability and "hypomotor." Dr. Schneider rated plaintiff's pain and fatigue as a 6 on a 10-point scale, and noted that he was able to "completely relieve the pain with medication without unacceptable side effects." (TR 215)

Dr. Schneider assigned a residual functioning capacity to plaintiff as follows: she could sit for 3 hours out of 8; stand/walk 2 hours out of 8, and must get up and move around every 30 minutes for 10 minutes. He opined that plaintiff could lift and carry 10-20 pounds occasionally; had moderate limitations in grasping/turning/twisting objects; minimal limitations using fingers/hands for fine manipulations; and moderate limitations in using her arms for reaching. He also opined that plaintiff's symptoms would frequently be severe enough to interfere with attention and concentration, and that there were no emotional factors which contributed to the severity of plaintiff's symptoms and limitations. Dr. Schneider opined that plaintiff would be absent from work more than three times a month, and that her symptoms and limitations began in 1991. When asked if plaintiff could work a "full time competitive job that requires that activity on a sustained basis," Dr. Schneider answered "no." (TR 213-220)

---

[2]"Melena" is defined as the passage of dark-colored, tarry stools, due to the presence of blood altered by the intestinal juices. *Steadman's Medical Dictionary*, 27th Edition.

Plaintiff next saw Dr. Schneider on July 17, 2009, in follow-up to the rectal bleeding, and reported that Pepto Bismal "started the rectal bleeding." Her Xanax and Norco prescriptions were refilled at that time, and the physical exam again revealed a full range of motion in her neck. (TR 245) The lumber spine MRI of July 28, 2009, revealed facet arhropathy at L3-4, L4-5, and L5-S1; disc bulges at L1-2, L2-3, and L3-4; mild chronic anterior wedging of the superior endplate of L1, and scoliosis. There was no spinal or foraminal narrowing at L1-2 or L2-3, and borderline left foraminal narrowing but no central stenosis at L3-4. The facet arthropathy was described as mild, and there was no posterior disc herniation, or spinal or foraminal stenosis at L5-S1. (TR 261)

On September 24, 2009, Dr. Adeboye Francis conducted a consultative disability assessment. Dr. Francis noted that plaintiff was on medical therapy with stable symptoms regarding her rheumatoid arthritis, she had never had a rheumatologist evaluation, and last worked in 2007. Dr. Francis noted plaintiff's use of a non-physician prescribed simple cane, and stated that the device is "medical necessary only in case of falling" and that plaintiff used it for walking, support and balance. Plaintiff could walk about 20 feet without the cane and there is no limitation associated with the use of the cane. Dr. Francis noted that plaintiff was able to get on and off the exam table without difficulty. His physical exam revealed a restricted range of motion in the cervical and thoracic spine, antalgic gait, bony point tenderness at the cervical and lumbar spine levels, and a positive bilateral straight leg raising test at 40-45 degree. Her sensory exam, deep tendon reflexes, muscle tone, and strength were all normal. His assessment was that plaintiff had neck and low back pain but would benefit from pain therapy as well as orthopedic evaluation and management, and her chronic fatigue syndrome and depression were stable. He recommended further evaluation

and management of her myalgia/polyarthralgia, and opined that she would benefit from a wrist brace for her carpal tunnel syndrome.  (TR 264-267)

Plaintiff next was seen by Dr. Fred Tuton, a clinical psychologist, on October 1, 2009.  Disability Determinations Services referred plaintiff to Dr. Tuton for an assessment of her mental status.  Plaintiff reported to Dr. Fred Tuton that she drives a car, and had driven herself from St. Francisville to Dr. Tuton's office in Baton Rouge.  Plaintiff reported that she was able to perform basic personal hygiene and some domestic tasks (ADL's) without assistance, and she was responsible for the management of her financial affairs. Plaintiff completed the Claimant Form and Patient Questionnaire without assistance, and reported that she enjoys reading in her spare time, socializes with a friend in California by telephone, and that she stopped working when her employer moved their office.

Her chief complaint was depression and sleep problems since 2001, and her current symptoms included crying, fatigue and chronic pain.  She reported that her medications helped, and that this chief complaint interferes with her ability to work for the past two years due to pain in her hands and resulting in an inability to type.  The examiner observed that plaintiff's gait was normal and she did not need assistance ambulating, her posture was good and upright, and she sat comfortably in her chair.  She was talkative and interested in the interview process, and she reported no hallucinations/delusions, no current thoughts of suicide/homicide, and no current thoughts of hopelessness/worthlessness.  Plaintiff rated her depression with medication as a 5 on a 10-point scale.  She reported no changes in memory, demonstrated logical thought processes, and maintained concentration and persistence.   Dr. Tuton opined that plaintiff had a moderate impairment from a psychological standpoint with regard to her physical functioning, social abilities, and

8

adaptation. He diagnosed plaintiff with pain disorder associated with both psychological factors and a general medical condition, along with an unspecified adjustment disorder which was chronic due to physical problems and an inability to work. (TR 271-274) The Psychiatric Review Technique was conducted on October 16, 2009, which supported Dr. Tuton's findings, and further indicated that plaintiff's responses on the questionnaire indicated she can pay attention, is able to follow instructions, and gets along "ok" with authority figures. She was able to cook simple meals, does minor household chores, drives, shops, and attends church. (TR 277-289).

Plaintiff also underwent the RFC assessment on October 16, 2009, which indicated a residual functioning capacity for a modified range of light work with regard to postural limitations.[3] (TR 291-298) The examiner noted, however, that plaintiff's statements were only partially credible, and that the need for an assistive device was questionable. In support of same, the examiner noted that while plaintiff reported "weakness/giveway in legs," the records showed no prior complaints or issues. Also, while plaintiff exhibited a limited range of motion and antalgic gait with an assistive device when undergoing Dr. Francis' consultative examination on September 24, 2009, she exhibited a normal gait without an assistive device when undergoing Dr. Tuton's psychological examination on October 1, 2009. (TR 296).

Plaintiff returned to Dr. Schneider on October 28, 2009, complaining of aches and pains in her hands, knees, ankles, neck, and right shoulder, which she reported were

---

[3]20 CFR §404.1567 defines the physical exertion requirements of light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

weather induced. Dr. Schneider's exam revealed a full range of motion in her neck, and diagnosed her with high blood pressure, chronic fatigue, post-traumatic stress disorder, and rheumatoid arthritis. (TR 325) On November 20, 2009, she complained of lightheadedness and thought her blood pressure might be low. Dr. Schneider's diagnosis remained unchanged. (TR 324) She saw Dr. Schneider on December 28, 2009, and January 15, 2010, with regard to a dog bite, and there is no indication that she had any complaints of back or neck pain. (TR 321-322)

Plaintiff returned to Dr. Schneider on February 3, 2010, complaining that her back and knees felt stiff and painful, especially with weather changes, and reported she was "still having emotional breakdowns." The examination revealed a full range of motion in her neck, and her diagnosis remained unchanged. (338) On March 31, 2010, plaintiff saw Dr. Schneider complaining that the right side of her neck and right shoulder were hurting more than usual and that she was "real emotional and just not feeling well, no motivation." Her neck was tender at several places, and her diagnosis now included "spinal deformity," depression, anxiety, and multifocal pain, in addition to the rheumatoid arthritis, and chronic fatigue syndrome. (TR 336) Dr. Schneider also has a notation that reads, "letter to attorney - narrative." (TR 336)

On April 9, 2010, plaintiff reported that she had fallen, injuring a rib and requesting prescriptions; however, it is unclear from the record if she actually saw Dr. Schneider on that date. The same document shows that on April 14, 2010, plaintiff requested Vicoden, which was denied, and on April 16, 2010, she requested Lortab, which was placed on hold. (TR 335) Thereafter, on April 19, 2010, plaintiff returned to Dr. Schneider, stating that she needed a narrative for her lawyer, and she was in a lot of pain from the rib injury. The only

diagnosis provided by Dr. Schneider at that visit was a notation that reads, "letter to attorney for disability." (TR 334)

Dr. Schneider prepared the requested narrative on April 19, 2010, noting that plaintiff had congenital scoliosis from birth and "roto or dextroscoliosis now with associated spinal deformities and spinal stenosis." He also stated that plaintiff has cervicalgia with disc disease at level of C5-6, underlying high blood pressure and confirmed rheumatoid arthritis. She suffered a massive trauma from a motorcycle accident fifteen years ago, which resulted in a shortened right leg, and has PTSD from the massive trauma. He also opined that plaintiff has "multifocal pain akin to fibromyalgia," low back pain and facet arthropathy, and bulging disc disease, chronic fatigue syndrome, anxiety and depression. He also opined that "frequent falls have contributed to T8 compression fracture and most recently left 7th rib fracture." He further opined that plaintiff required chronic pain management "for all this." (TR 330-331)

Continuing with plaintiff's medical history, on April 26, 2010, plaintiff requested an early refill of her Soma and Norco prescriptions, and on April 28, 2010, the Norco prescription was changed with a note to "please decrease medication to as directed." (TR 333) Plaintiff next went to see Dr. Schneider on April 30, 2010, as a follow-up to her rib injury, and complained of vertigo, dizzy spells and ringing in her left ear. Dr. Schneider noted her chronic pain, but made a notation of "no new tests" in her record. His diagnosis now was scoliosis and rheumatoid arthritis.

On June 29, 2010, plaintiff complained to Dr. Schneider that her back was sore, "kind of twisted it the other day falling," and reported that she was "leaving on vacation soon" and "off to Alaska [in] July." Her neck showed a full range of motion, and she

requested prescription refills; however, the record also reflects that her prescription for Celebrex was discontinued. Dr. Schneider's diagnosis again was rheumatoid arthritis and scoliosis. (TR 348) It is at this point that the medical records conclude.

## GOVERNING LAW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to a determination of whether the Commissioner's decision was supported by substantial evidence existing in the record as a whole and whether the Commissioner applied the proper legal standards. *E.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). In applying the "substantial evidence" standard, the Court must carefully scrutinize the record to determine if, in fact, substantial evidence supporting the decision does exist, but the Court may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute its judgment for the Commissioner's even if the evidence preponderates against the Commissioner's decision. *Id.* Substantial evidence means more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept to support a conclusion. *Id.* A finding of "no substantial evidence" will be made only where there is a conspicuous absence of credible choices or an absence of medical evidence contrary to the claimant's position. *Id.*

The overall burden of proving disability under the Social Security Act rests on the claimant. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). If the claimant proves that she no longer is able to work in her past relevant work, then and only then does the burden shift to the Commissioner to establish that the claimant nonetheless has the ability to engage in other substantial gainful activity. *E.g., Rivers v. Schweiker*, 684 F.2d 1144, 1155-1156 & n.14 (5th Cir. 1982). Thus, in cases such as this one where the Commissioner

12

determines that the claimant is capable of performing her past relevant work and accordingly reaches only the fourth step of the five-step disability sequential analysis, the burden of persuasion remains with the claimant to show an inability to return to her past relevant work.

***ISSUES***

The issue before this Court is whether the Commissioner's finding that Wendy Susan Rennert-Lovett is not disabled is supported by the substantial evidence and was reached by applying the proper legal standards. 42 U.S.C. § 405(g).

Plaintiff argues for either reversal or remand based on the following grounds:

1)      The ALJ failed to follow the treating physician rule;

2)      The ALJ failed to properly evaluate Ms. Renner-Lovett's Credibility; and

3)      The ALJ relied upon flawed vocational testimony.

***DISCUSSION AND ANALYSIS***

***Issue 1 - Treating Physician Rule***

Plaintiff argues that the ALJ failed to state what weight was given to Dr. Schneider's opinion, but apparently rejected the opinion entirely, finding that Dr. Schneider relied on plaintiff's subjective complaints and not on appropriate clinical or objective evidence. (rec.doc. 9-2, pg. 11) Plaintiff further argues that Dr. Schneider's opinions are also "entirely uncontradicted by any other medical opinion in the record," and because Dr. Francis failed to provide any opinion on plaintiff's functional capacity, the ALJ should have afforded Dr. Schneider's opinions controlling weight. Plaintiff characterizes the RFC determined by the ALJ as an "impermissible lay assessment of the record."

In response, the Commissioner argues that the record as a whole did not support Dr. Schneider's restrictive findings. (TR 34-35). The Commissioner notes that the ALJ's decision indicates that he considered the March, 2009, thoracic spine x-ray which indicted scioliolis and degenerative changes with no definite fracture; the July, 2009, lumbar spine MRI which revealed no disc herniation with mild findings; and the November, 2006, cervical spine x-ray that was negative. The Commissioner also points to Dr. Schneider's own treatment records which suggested that plaintiff was not as limited as he opined she was on the questionnaire.

The governing law in the Fifth Circuit is that the opinions, diagnoses, and medical evidence of treating physicians who are familiar with a plaintiff's condition should be accorded considerable weight in determining disability. *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000). An ALJ may give less weight to a treating physician's opinion only when there is good cause shown to the contrary. *Id.* Good cause includes instances where the physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or otherwise unsupported by the record. *Hospital Service District No. 1 Of The Parish Of LaFourche v. Thompson*, 2004 WL 192047, *3 (E.D. La. Aug. 25, 2004). Also, the general rule is that a treating physician's opinion on the nature and severity of a claimant's impairments will be given "controlling weight" only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If the treating physician's opinion is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic tests or otherwise unsupported by the evidence, the ALJ has good cause for discounting the treating physician's opinion in favor

14

of other experts, not giving the opinion considerable weight. *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001), *Newton*, 209 F.3d at 456 (*citing Brown v. Apfel*, 192 F.3d 492,500 (5th Cir. 1999).

Also, the regulations and circuit law are clear that while it is within the ALJ's discretion to assign greater or lesser weight to the medical evidence, it is not within his discretion to reject the opinion of a treating physician without a detailed analysis[4] of the treating physician's view. 1920 C.F.R. § 404.1527(d)(2), SSR 96-2p. See also, *Reynolds v. Astrue*, 2010 WL 583918, at *7 (N.D. Miss. 2010). However, that detailed analysis is only required in the absence of competing first-hand medical evidence. *Newton*, at 456-458.

Here, the ALJ discussed Dr. Schneider's opinion in great detail, noting that plaintiff received conservative treatment with "positive results" (TR 31), and that plaintiff continued to be treated by Dr. Schneider with minimal restrictions being placed, and no surgery or specialized treatment being recommended or sought. (TR 34) The ALJ discussed the competing first-hand medical evidence, which included the mild findings of the radiologic studies in addition to Dr. Schneider's own notes which indicated there was a pharmacy alert due to possible excessive utilization of narcotic medications, Dr. Schneider's opinion that pain or symptoms would interfere frequently with plaintiff's attention and concentration, but that plaintiff's pain was "completely relieved with pain medications," Dr. Francis' examination wherein plaintiff was able to get on and off the examination table without difficulty, and Dr. Tuton's examination wherein plaintiff reported being unable to work due

---

[4]"Detailed analysis" refers to the six factors set forth in § 404.1527(e) and explicitly applies only to medical opinions, not disability opinions, as those opinions are reserved for the Commissioner. *See Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003).

to pain in her hands and that her job ended secondary to office relocation. (TR 32-34) The ALJ opined that the "course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled." (Id.) Simply speaking, the ALJ found that Dr. Schneider's opinions conflicted not only with the diagnostic studies, but also with his own treatment records. Because there is competing first-hand medical evidence, the ALJ is not required to perform a detailed analysis of the treating physician's view.

Also, the Commissioner acts well within his discretion when he discounts an opinion of a treating physician that is only conclusory in nature without any supporting clinical or laboratory findings. *Scott v. Heckler*, 770 F.2d at 485 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 621 ( 5th Cir. 1983); *Oldham v. Schweiker*, 660 F. 2d 1078, 1084 (5th Cir. 1981). Furthermore, an ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Bradley v. Bowen*, 809 F. 2d 1054, 1057 (5th Cir. 1987). In the present matter, a review of the record as a whole shows that the ALJ acted within his discretionary boundaries with respect to the weight he assigned to Dr. Schneider's opinion. In the final analysis, conflicts in the medical evidence are to be resolved by the Commissioner, not by the courts. *E.g.,Oldham*, 660 F.2d at 1084. Plaintiff's arguments in this regard therefore are without merit.

### Issue 2 - Plaintiff's Credibility Analysis

Plaintiff argues that the ALJ's credibility analysis was insufficient, and that her testimony was entirely consistent with the description of her symptoms and limitations in the medical records, particularly Dr. Schneider's records. Plaintiff also contends that the ALJ ignored critical objective imaging and clinical abnormalities, and did not give any

plausible reasons for finding her testimony not credible. Plaintiff asserts that her impairments preclude even sedentary work activities.

First, it is to be expected that plaintiff's testimony correlates with what she reported to her physician. Where plaintiff's testimony became less credible to the ALJ is when it was compared to the record evidence, including the imaging studies, her visits to other providers, and her activities of daily living. Moreover, in the Fifth Circuit, pain only constitutes a disabling condition when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). Here, plaintiff's treating physician opined that plaintiff's pain was completely relieved with medication and with no unacceptable side effects. (TR 215) Thus, her pain was wholly responsive to therapeutic treatment.

Further, the Fifth Circuit has held that the Commissioner may consider evidence of participation in daily activities and household chores in conjunction with other evidence when determining disability. *Reyes v. Sullivan*, 915 F.2d 151, 154-55 (5th Cir. 1990). Plaintiff testified that her daily routine consists of getting her 11-year old daughter up for school and preparing her lunch, light household chores, feeding a pet, and helping her daughter with homework. She attends church and school activities and can walk 100 feet. (TR 34) The record also reflects that plaintiff testified that she drives some, prepares prepackaged dinners, does some laundry, wipes down countertops, straightens little things, and she does some shopping. (TR 52-67) Thus, her activities of daily living conflict with her subjective complaints of pain.

However, it is also well noted that allegations of pain must be corroborated by objective medical evidence. *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991); *Houston*

17

*v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). In judging a claimant's credibility, the ALJ can consider such things as medical reports, the claimant's daily activities, and the medications the claimant is taking. *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991). "The ALJ must weigh the objective medical evidence and assign articulated reasons for discrediting the claimant's subjective complaints." *Pineda v. Astrue*, 2008 WL 3341022 (C.A. 5. (Tex.)); *Falco v. Shalala*, 27 F.3d 160, 163. (5th Cir. 1994). Also, subjective evidence need not take precedence over objective evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990)

In this case, the medical evidence did not indicate a basis for the magnitude of the pain alleged by plaintiff. Evidence that plaintiff receives only conservative pain treatment substantially supports the ALJ's adverse credibility finding against complaints of incapacity and severe pain. *Parfait v. Bowen*, 803 F.2d 810, 813-14 (5th Cir. 1986). Also, "if an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability." *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988). Here, plaintiff received conservative pain treatment, and her treating physician stated that her pain was completely relieved by medication.

Further, in evaluating a claimant's RFC, an ALJ may consider descriptions from physicians, the claimant or others, and the claimant's credibility. *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988). Here, the ALJ considered the record as a whole, and therefore, properly evaluated the intensity and persistence of plaintiff's alleged symptoms, including her subjective complaints of pain, and considered the medical evidence when he accorded limited weight to plaintiff's complaints of disabling pain, and succinctly articulated

18

his reasons for doing so.   Also, in the absence of uncontroverted medical evidence which shows a basis for a claimant's pain, the ALJ's "evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence." *James v. Bowen*, 793 F.2d 702, 706 (5th Cir.1986). Thus, the ALJ properly detailed the evidence he considered, and specified the relevant factors as outlined in the case law and regulations which he used to assess the credibility of plaintiff's statements.   Plaintiff's arguments in this regard are without merit.

### Issue 3 - Vocational Expert Hypothetical

Plaintiff argues that since the RFC was not based on any affirmative evidence in the record, the ALJ's reliance on the VE's testimony regarding plaintiff's ability to perform her past relevant work was inappropriate.    Plaintiff  admits that the ALJ must reasonably incorporate all disabilities of the claimant *recognized by the ALJ* into the vocational expert hypothetical ultimately relied upon by the ALJ as a basis for his decision.   (emphasis added)  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Here, the vocational expert hypothetical that the ALJ relied upon was not flawed for failure to include the limitations stated by Dr. Schneider because the ALJ, acting within his discretion after considering the record as a whole, did not recognize those limitations on the medical evidence presented. Further, although the ALJ  must and did in fact afford the claimant or her representative the opportunity to correct any deficiencies in the ALJ's question by mentioning or suggesting to the expert any purported defects,  claimant's attorney never examined the expert.  (TR 73).  Reliance on the vocational testimony thus was not error.

Therefore, although the ALJ did not reach a result that was favorable to the plaintiff, his determination was well reasoned and supported by the substantial evidence in the record and was reached using the proper legal standard.

## RECOMMENDATION

Accordingly, for the foregoing reasons, it is the recommendation of the Magistrate Judge that the decision of the Commissioner denying benefits be **AFFIRMED**, and that the claimant's complaint be **DISMISSED.**

Signed in Baton Rouge, Louisiana, on August 3, 2012.

**MAGISTRATE JUDGE DOCIA L. DALBY**

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**WENDY SUSAN RENNERT-LOVETT**  **CIVIL ACTION**

**VERSUS**  **NUMBER 11-662-BAJ-DLD**

**MICHAEL J. ASTRUE, Commissioner**
**of Social Security**

### NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U.S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have 14 (fourteen) days from date of receipt of this notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on August 3, 2012.

_____

**MAGISTRATE JUDGE DOCIA L. DALBY**